UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>     Plaintiff,<br><br>     v.<br><br>TRAFFIC AND FUNNELS, LLC, a limited liability company;<br><br>WE CAPITAL, LLC, a limited liability company, also d/b/a The Sales Mentor and The Sales Mentor, LLC;<br><br>EVANS AND WELCH, INC., a corporation;<br><br>EVANS AND WELCH HOLDINGS, LLC, a limited liability company;<br><br>TAYLOR A. WELCH, individually and as an officer of Traffic and Funnels, LLC; WE Capital, LLC; Evans and Welch, Inc.; and Evans and Welch Holdings, LLC;<br><br>CHRISTOPHER A. EVANS, individually and as an officer of Traffic and Funnels, LLC; WE Capital, LLC; Evans and Welch, Inc.; and Evans and Welch Holdings, LLC;<br><br>PAYTON WELCH, individually; and<br><br>ASHTON SHANKS, individually and as an officer of Evans and Welch, Inc.,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the FTC Act, 15

U.S.C. §§ 53(b), 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act

("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, which authorize the FTC to seek, and the Court to order, permanent injunctive relief, monetary relief, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and that the Commission has previously determined to be unfair or deceptive. Defendants' violations are in connection with the deceptive and unlawful advertising, marketing, promotion, distribution, and selling of money-making and investment opportunities.

## SUMMARY OF CASE

2. Since at least 2018, Defendants, operating through a network of interconnected business entities as a common enterprise, have marketed a telemarketing sales training and coaching program and a variety of related products under a multitude of brand names, including the "Sales Mentor" program. Using online advertisements and telemarketing, Defendants have promoted this program as a highly lucrative money-making and investment opportunity.

3. Defendants have employed a variety of unsubstantiated and false earnings claims to convey the impression that consumers who purchase the Sales Mentor program were likely to make substantial earnings and profits. They have convinced numerous consumers to spend hundreds or thousands of dollars each to purchase the program. In total, since 2019, consumers have paid Defendants more than $29 million for the Sales Mentor program. Defendants' deceptive conduct has caused significant injury to many thousands of consumers across the country and violated the FTC Act and the TSR.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

2

5.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

**PLAINTIFF**

6.     The FTC is an independent agency of the United States government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.   15 U.S.C. §§ 41–58.   The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive acts or practices in or affecting commerce, and the Telemarketing Act, 15 U.S.C. §§ 6101–6108.   Pursuant to the Telemarketing Act, the FTC promulgates and enforces the TSR, 16 C.F.R. Pt. 310, which prohibits deceptive and abusive telemarketing practices.

**DEFENDANTS**

7.     Defendant **Traffic and Funnels, LLC ("Traffic and Funnels")** is a North Carolina limited liability company with its principal place of business at 393 Nichol Mill Lane, Suite 260, Franklin, TN 37067.   Traffic and Funnels transacts or has transacted business in this District and throughout the United States.   At all times relevant to this Complaint, acting alone or in concert with others, Traffic and Funnels has advertised, marketed, distributed, or sold money-making and investment opportunities to consumers throughout the United States.

8.     Defendant **WE Capital, LLC ("WE Capital")**, also doing business as The Sales Mentor and The Sales Mentor, LLC, is a North Carolina limited liability company with its principal place of business at 393 Nichol Mill Lane, Suite 260, Franklin, TN 37067.   WE Capital transacts or has transacted business in this District and throughout the United States.   At all times relevant to this Complaint, acting alone or in concert with others, WE Capital has

3

advertised, marketed, distributed, or sold money-making and investment opportunities to consumers throughout the United States.

9.      Defendant **Evans and Welch, Inc. ("Evans and Welch")** is a Tennessee corporation with its principal place of business at 393 Nichol Mill Lane, Suite 260, Franklin, TN 37067.   Since April 2020, Evans and Welch has been the 100 percent owner and member of Traffic and Funnels.   Evans and Welch transacts or has transacted business in this District and throughout the United States.   At all times relevant to this Complaint, acting alone or in concert with others, Evans and Welch has advertised, marketed, distributed, or sold money-making and investment opportunities to consumers throughout the United States.

10.      Defendant **Evans and Welch Holdings, LLC ("EW Holdings")** is a Delaware limited liability company with its principal place of business at 393 Nichol Mill Lane, Suite 260, Franklin, TN 37067.   EW Holdings transacts or has transacted business in this District and throughout the United States.   At all times relevant to this Complaint, acting alone or in concert with others, EW Holdings has advertised, marketed, distributed, or sold money-making and investment opportunities to consumers throughout the United States.

11.      Defendant **Taylor A. Welch** is the co-Chief Executive Officer of Traffic and Funnels, WE Capital, and EW Holdings.   Until at least June 2022, he was also the co-Chief Executive Officer and co-owner of Evans and Welch, and presently continues to be a co-owner of Evans and Welch.   Taylor A. Welch directly participated in the development and dissemination of marketing materials and ads for the Sales Mentor program with knowledge that such materials included false or unsubstantiated earnings claims.   He has also presented in numerous marketing videos for this program in which he makes unsubstantiated earnings claims. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated,

4

directed, controlled, had the authority to control, or participated in the acts and practices of WE
Capital, Traffic and Funnels, Evans and Welch, and EW Holdings, including the acts and
practices set forth in this Complaint. Taylor A. Welch resides in this District and, in connection
with the matters alleged herein, transacts or has transacted business in this District and
throughout the United States.

12. Defendant **Christopher A. Evans** is the co-Chief Executive Officer of Traffic
and Funnels, WE Capital, and EW Holdings. Until at least June 2022, he was also the co-Chief
Executive Officer and co-owner of Evans and Welch, and presently continues to be a co-owner of
Evans and Welch. Evans directly participated in the development and dissemination of
marketing materials and ads for the Sales Mentor program with knowledge that such materials
included false or unsubstantiated earnings claims. He has also presented in marketing videos for
the Sales Mentor program in which he makes unsubstantiated earnings claims. At all times
relevant to this Complaint, acting alone or in concert with others, he has formulated, directed,
controlled, had the authority to control, or participated in the acts and practices of WE Capital,
Traffic and Funnels, Evans and Welch, and EW Holdings, including the acts and practices set
forth in this Complaint. Evans resides in North Carolina and, in connection with the matters
alleged herein, transacts or has transacted business in this District and throughout the United
States.

13. Defendant **Payton Welch** served as a salesperson and sales director for WE
Capital and the Sales Mentor program. He was also an employee of Traffic and Funnels.
Defendant Payton Welch directly participated in the development of deceptive marketing
materials and ads for the Sales Mentor program and related products. He has also presented in
several marketing videos for the Sales Mentor program in which he makes unsubstantiated

5

earnings claims. Payton Welch is the brother of Defendant Taylor A. Welch. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, and participated in the acts and practices of Traffic and Funnels, WE Capital, and the Sales Mentor program, including the acts and practices set forth in this Complaint. Payton Welch resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

14. Defendant **Ashton Shanks** has been, since June 2022, the Chief Executive Officer and an owner of Evans and Welch, and was an employee of Traffic and Funnels from January 2019 to February 2020. Shanks has been involved in the development and supervision of deceptive marketing materials or ads for the Sales Mentor program. Since at least June 2022, and at many times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Evans and Welch and the Sales Mentor program, including the acts and practices set forth in this Complaint. Shanks resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

15. Defendants WE Capital, Traffic and Funnels, Evans and Welch, and EW Holdings (collectively, "Common Enterprise Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below. The Common Enterprise Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, employees, independent contractors, business functions, and

6

office locations, and that have commingled funds.   Because they have operated as a common enterprise, each of the Common Enterprise Corporate Defendants is liable for the acts and practices alleged below.

## COMMERCE

16.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

17.     Through telemarketing, the internet, and social media (primarily YouTube and Facebook), Defendants have deceptively advertised, marketed, promoted, and sold money-making and investment opportunity products and services to consumers throughout the country. These products and services have included a telemarketing sales training and coaching program, commonly known as the Sales Mentor program, which Defendants promised would teach consumers "high-demand" sales skills as a telemarketing "closer."   Defendants have marketed and sold their Sales Mentor program under multiple brand names, including The Sales Mentor, Sales Closer Academy, Inbound Closer, Inbound Closer Accelerator, and Sales Pro Academy (collectively, referred to herein as the "Sales Mentor" program).

18.     Defendants have promised that consumers who purchase the Sales Mentor program would be able to reliably and consistently earn substantial income and profits, while working only part-time and without needing to start their own businesses.   Defendants have further promised consumers that Defendants had a large waiting list of businesses in need of telemarketing sales closers, and that Defendants' program would connect consumers who purchase the Sales Mentor program to these businesses.

7

19.     Defendants have represented that The Sales Mentor has "helped over 25,000 people find secure, dependable, consistent and life-changing incomes," and that consumers who purchase the Sales Mentor program would earn or were likely to earn between $10,000 and $20,000 per month on average.   Defendants' ads have included detailed statements about the amount of money, average sales commission amounts, average telemarketing closing rates, and average net income that purchasers of the Sales Mentor program have earned, would earn, or would likely earn.

20.     As detailed below, Defendants' earnings and related claims have been false or unsubstantiated.

21.     From January 2019 to October 2022, Defendants have taken more than $29 million from consumers who purchased their Sales Mentor program.

**The Sales Mentor Packages**

22.     Through the sales process described below, Defendants have offered different levels of Sales Mentor program packages in tiered pricing, ranging from $97 for a training that gave access to a video library and a sales script ("Inbound Closer Accelerator" training), to a mid-range package priced at around $497 to $600 ("Inbound Closer Certification" training), to the highest-priced package offering "private" one-on-one training and coaching at around $8,800 to $9,800 dollars ("Private Coaching").

23.     The Private Coaching package also commonly included access to a weekly live group sales call and additional sales training videos.   Many consumers have reported that the promised one-on-one "private" coaching never materialized and was never "private."   In some instances, purchasers of the Private Coaching package have also complained that much of the content or materials they received had been previously made available for free, or within one of

8

the two lower-priced packages.

**Defendants' Sales Process**

24.     Consumers have usually learned about the Sales Mentor program through Defendants' social media and internet ads, which invited consumers to click on links that redirected consumers to Defendants' websites.   These websites typically would offer consumers "free" training presentations, phone consultations, and additional information about the Sales Mentor program, and would then ask consumers to provide their email addresses and contact information to gain access to such materials or the phone consultation.

25.     A screenshot of one such sign-up link, taken on April 8, 2022, is depicted below. The sign-up link touts the potential to earn "$10k+/Month" and promises that the training is free.



26.     After arriving at Defendants' websites, consumers have typically been invited to view a video narrated by Defendant Taylor A. Welch or his brother, Defendant Payton Welch. These marketing videos have commonly included numerous lavish claims that consumers who purchase the Sales Mentor program are likely to earn substantial income and profits.

9

27.     To further induce consumers into purchasing the Sales Mentor program (and other similar programs), Defendants have repeatedly made extravagant claims about the purported extraordinary business success of the companies and of the companies' principals, Defendants Taylor A. Welch and Christopher A. Evans.

28.     For example, claims about Taylor Welch's exceptional success as an entrepreneur, and about the spectacular successes of his various businesses include:

- "Taylor is an internationally acclaimed business consultant and entrepreneur. He's advised & serviced over 50,000 business leaders in the last 5 years and currently sits as CEO over four multi-8 figure business brands."

- "Today [Taylor Welch] owns a $21 million company where he teaches online entrepreneurs how to go from high 6 or even 7 figures to $10 million and beyond by helping them with their inbound marketing and sales process."

- "Armed with the Reflex Selling System, Taylor and [another salesperson] have gone on to close a combined 60 million+ in sales."

- The Sales Mentor has "helped over 25,000 people find secure, dependable, consistent and life-changing incomes."

- "[A]nd before we knew it we looked up and we had 180 staff, clients all over the world . . . at one point, I think in the year 2021, just one of the businesses trained nearly 30,000 sales professionals in a year."

- "We have done a couple hundred million dollars in revenues for clients, and we're in 120 different industries."

29.     After collecting the consumers' contact information, Defendants have initiated telemarketing calls to consumers in which Defendants have repeated and reinforced the same or similar deceptive earnings claims made in their social media and internet ads.

30.     To further convince consumers to purchase their Sales Mentor program, Defendants have also routinely represented that Defendants would connect purchasers with

"hundreds" of business owners seeking to hire sales closers who have been trained by Sales Mentor.

31.     For example, in marketing videos captured by the FTC in April 2022 and July 2022, Taylor A. Welch states that consumers who purchase the Sales Mentor program would be connected to a large "waiting list" of business owners who are in need of sales closers trained by the Sales Mentor.   He represents that Defendants "have dozens and dozens and dozens of business owners who need people just like you to come in and close for their business while earning potentially 20 thousand dollars or more in commission."   In a document emailed in April 2022 to an FTC investigator posing as a consumer, Payton Welch asserted that over 757 business owners have invested in his brother Taylor A. Welch's business, in order to get "connected" with inbound sales closers who have been trained by The Sales Mentor.

32.     In truth, the "connection" to a large list of employers Defendants have promised often turned out to be nothing more than access to scant or outdated job listings.   Following the sales calls, Defendants have typically bombarded consumers with additional emails, videos, and marketing materials, many of which continued to repeat the same or similar false and unsubstantiated earnings claims.

**Defendants' Marketing Has Been Rife with Unsubstantiated or False Earnings Claims**

Unsubstantiated or False Earnings Claims in Marketing Materials and Videos

33.     Lavish earnings claims dominate Defendants' marketing of the Sales Mentor program, including in numerous marketing videos.   Typical examples include:

- "And if you follow the steps that I'm gonna show you in this video, you'll have an army of entrepreneurs with multi-million dollar businesses practically beating down your door . . . DESPERATE TO HAND YOU A GIANT COMMISSION CHECK OF $980 OR MORE SIMPLY BECAUSE YOU HAVE THE ONE EASY TO LEARN SKILL THAT THEIR

11

BUSINESS CAN'T SURVIVE WITHOUT."

- "This High-Demand Skill Puts You Dead-Center in A Thriving, $129 Billion-Dollar Industry That Will Stuff Your Pockets With Daily Commission Checks of $980 or More."

- "[T]hese commissions can get so massive . . . it's virtually IMPOSSIBLE NOT to enjoy a job-replacing six-figure income, even part-time."

- "[Y]ou can expect to close and get a fat commission check on 40% of your calls."

34.     Christopher A. Evans, Payton Welch, and Taylor A. Welch often have made earnings claims on Sales Mentor marketing videos.   For example, in one marketing video captured in July 2022, Evans made the following representation:

> [A]s a high-ticket closer, you'd earn around 8-12 % of every deal closed . . . . Earning you an average of $700-$1000 for every single deal that you finalize . . . which often happens in about 45-60 minutes or less.

35.     In a marketing video for Inbound Closer captured in February 2022, Payton Welch describes how he purportedly was able to earn "daily $980 commission checks" by simply closing on behalf of existing businesses, and without needing to incur the expenses of having to start his own business:

> And I started making more money than most entrepreneurs, except I didn't actually have to start a business.   Because using this skill, I plugged into businesses that already existed and shaved off those daily $980 commission checks for helping them.

36.     Payton Welch further describes how he was able to earn "a stable six-figure income" by working only part-time, on his own schedule:

> [W]ithin a week, I had people lining up to pay me.   Within two weeks, I had already made $15,460 in commissions.   And within 21 days, I looked in my bank account and I saw something crazy . . . I had earned more money in those 21 days than I had earned in SIX MONTHS at my old job.   Not to mention I did it part-time, on my

12

own schedule, using nothing but a cell connection. So I could earn a stable six-figure income on my own terms from anywhere I wanted.

37.     In another marketing video, captured in January 2022, Payton Welch states:

"[L]ike I showed you before . . . I averaged about $30K [in commissions] per month. Plus,

that's only with ONE client." He further states that:

> [A]nother 1,621 people—400 in this past week alone . . . have already joined me in using the simple, straight-to-the-money side-hustle to FREE themselves from their nine-to-five prison cell in as little as 21 days, while working part-time from anywhere in the world.

38.     Likewise, Taylor A. Welch often has represented in marketing videos that Sales

Mentor clients earn on average between $10,000 and $20,000 per month. For example, in a

marketing video captured in April 2022, Taylor A. Welch says: "10-20 thousand dollars a month

in earning potential is what we're seeing on average." He explains:

> The average KPI is 20% closing ratio. The average commission is 8 to10%, and the average price point is $8 to 10 thousand dollars. . . . That's 600 bucks to a thousand bucks per close. . . . Let's just do the math right now. Twenty-five times .2, that's five closes per week. At $600 dollars per close. You're at $3,000 dollars per week and $12,000 dollars per month of net take-home income.

39.     Taylor A. Welch states that such average monthly earnings can be done while

working part-time, and that many Sales Mentor clients make well above $12,000 a month:

> I've trained a lot of different people how to make several hundred thousand dollars per year, more than 20, 30, 40, 50 thousand dollars. . . .
> Now I don't know what you do right now for a living, but I would imagine that you can't work a couple hours per day from wherever you want to in the world and pull in 12 thousand dollars a month net income . . . and this is just average. . . . So we have closers who, like I said, have done 40, 50, 60, so you can imagine how this can scale for you the better and better and better you get. I'm just using conservative numbers.

13

40.    Contrary to their earnings claims, Defendants have not tracked the earnings, income, commissions, net profits, or overall success achieved by purchasers of the Sales Mentor program.   Consequently, Defendants' widely used claims regarding the earnings that consumers who purchase their Sales Mentor program had made or were likely to make have been wholly unsubstantiated or false.

<u>Unsubstantiated or False Earnings Claims Made in Telemarketing Calls</u>

41.    Defendants' telemarketers have made similar false or unsubstantiated earnings claims in sales calls with consumers.   For example, on an April 11, 2022 call between Defendants' telemarketer and an FTC investigator posing as a consumer, the telemarketer stated:

> [L]et's just say we can get you to a minimum of 20 percent close ratio, meaning every five calls you take, you close one out of five. . . .   That's pretty standard for people just getting into this for the beginning.   It's a lot less for untrained people.   But when we train them, we get them for, like, 20/25 percent out the gate. . . . That means you're making about $1,000 bucks a day, 5 grand a week, 20K a month.

42.    In a follow-up call on April 12, 2022, the telemarketer told the investigator: "You invest 9,800 bucks with me, and in three months, we'll get you on track to make $120 grand a year."

43.    In a call made on September 6, 2022, between another of Defendants' telemarketers and an FTC investigator posing as a consumer, the telemarketer stated that a full-time inbound closer could make $28,000 a month, or around $300,000 a year:

> [D]o you mind if I maybe give you my crash course on what income could look like for an inbound closer? . . .   So let's just kind of look at this from like a number standpoint.   If you're working for a company, and let's say you're closing an offer, like the product is $10,000.   Ten percent commission is average, okay? . . .   If we're working 40 hours a week, okay, that means we could probably take 40 calls.   Average show-up rate is 80 percent.   So out of that, you get 32 calls.   Average close rate, we'll say it's like 30 percent, but

14

since you're newer, we'll say 25. So 25 percent of those 32 calls would be an average close for someone newer to the game, right? So that comes out to around 7. My math might be a little low, but 7. Okay? So 7 times 1,000 is weekly income for someone who has a full-time calendar of calls inbound closing. . . . So that comes out to about 28 a month; annual, around 300.

44.    On September 14, 2022, one of Defendants' telemarketers made the following

earnings representations to an FTC investigator posing as a consumer:

Now, the average offer is around $10,000 for high ticket sales, but in order to quality [sic] as a high ticket offer, typically it needs to be at least $5K. . . . [T]he average commission is about 10 percent across the board. . . . So 10 percent on a $5,000 offer, you're making $500 per close. . . . So if you have four closes a week, you're making $500 per close, that's $2,000 a week. Now, you times that by four weeks, you've got $8,000 a month. And that's with a low ticket offer of $5,000. That's with the low hours of 20 hours a week. And that's with a commission of 10 percent. So if any of those numbers scale up, like let's say you double your hours and start working 40 hours a week, okay, you just doubled your income. You know, if your closing rate increases from 20 percent to, like, 30 percent, okay, that's a—that's a far bigger return as well. And then if you get on a bigger offer, like a $10K offer, that doubles your income as well.
. . .
[R]eplacing your $2000 income, that's not going to be difficult to do. Just having been in this industry for the last three years, like, if you're making—if you're making, like, $6,000 a month or less, something—something's very wrong.

45.    In another sales call made in July 2022 with an FTC investigator posing as a

consumer, a telemarketer who held himself out as a Director of Sales for the Sales Mentor

program and the main "instructor" who would train the consumer, boasted about his own

purported extraordinary successes as a telemarketer. He claimed to have made over $6 million in

sales in his first 12 months:

I got into sales. In my first month, I knew nothing, never took a sales call a day in my life, made 12 grand in my first month. And I went on and I never dropped below 20 grand ever since. . . . Now, that is of somebody who knows absolutely nothing, and I didn't even

15

have all the training that you would have if you came into here. And guess what, I went on to literally break every record that this company has ever had, and I generated, in my first 12 months of sales, over $6 million. . . . The beauty about that is you come into this program, I'm your number one instructor. I'm your number one guy that you deal with.

**Defendants' Earnings Claims Are Unsubstantiated or False**

46. The earnings and profits claims Defendants have used in the marketing of their Sales Mentor program have been unsubstantiated or false. As noted above, Defendants have never systematically tracked the earnings results of purchasers of the Sales Mentor program. Therefore, they have had no knowledge about the average earnings results of such consumers and possess no reasonable basis for their claims about the earnings results of purchasers of the Sales Mentor program, or for their claims about what future purchasers of the Sales Mentor program will earn or are likely to earn.

47. Since 2018, more than 55,360 consumers have purchased the Sales Mentor program. Defendants' deceptive conduct has caused significant injury to many thousands of consumers across the country and violated the FTC Act and the TSR.

**Common Enterprise Corporate Defendants Have Continued to Violate the Law Even After Receiving Notices of Penalty Offenses from the FTC**

48. In October 2021, FTC staff sent a letter to The Sales Mentor, along with copies of the Notice of Penalty Offenses Concerning Money-Making Opportunities and the Notice of Penalty Offenses Around Endorsements and Testimonials (attached hereto as Attachment A). The letter and Notices identified specific acts or practices that the Commission has determined are unfair or deceptive and violate Section 5 of the FTC Act.

49. As detailed in the Notices, in a series of litigated decisions the Commission determined, among other things, that it is an unfair or deceptive trade practice to make false,

16

misleading, or deceptive representations concerning the profits or earnings that may be anticipated by a participant in a money-making opportunity.

50.    As the letter stated, the above acts or practices were prohibited by final cease and desist orders, other than consent orders, issued in the cases (cited in the Notices) in which the Commission determined they were unfair or deceptive and unlawful under Section 5(a)(1) of the FTC Act.   The letter warned Defendants of their potential liability for civil penalties under Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), for knowingly engaging in acts or practices determined by the Commission to be unfair or deceptive and unlawful.

51.    The letter and Notices informed Defendants that, before publicizing potential earnings to prospective consumers, advertisers must possess adequate substantiation that the earnings described are representative of what participants will generally achieve.   The letter and Notices alerted Defendants that it is an unfair or deceptive trade practice to misrepresent explicitly or implicitly through the use of testimonials that the experience described by endorsers of a product or service represents the typical or ordinary experience of users.

52.    The letter instructed Sales Mentor to contact Commission staff if it had any questions or to visit the Commission's website at ftc.gov/MMO-notice and www.ftc.gov/endorsement-notice-penalty-offenses to obtain copies of the case decisions discussed in the Notice.

53.    Despite receiving the letter and Notices on October 27, 2021, Common Enterprise Corporate Defendants continued to make deceptive or unsubstantiated earnings claims in marketing their Sales Mentor program.

17

54. Therefore, based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

55. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

56. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I—False or Unsubstantiated Earnings Claims
### (All Defendants)

57. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of the Sales Mentor program, including through the means described in Paragraphs 22 to 47, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who purchase the Sales Mentor program will earn or are likely to earn substantial income, such as an average of $10,000 to $20,000 per month.

58. The representations set forth in Paragraph 57 are false, misleading, or were not substantiated at the time the representations were made.

59. Therefore, Defendants' representations as set forth in Paragraph 57 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

60. In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter. 16 C.F.R. Part 310.

18

61.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

62.     Defendants' goods and services, including Defendants' Sales Mentor program, are "Investment opportunit[ies]" as defined in the TSR, 16 C.F.R. § 310.2(s).   The TSR defines an "Investment opportunity" as "anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation."   16 C.F.R. § 310.2(s).

63.     The TSR prohibits sellers and telemarketers from "[m]isrepresenting, directly or by implication, in the sale of goods or services . . . [a]ny material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability."   16 C.F.R. § 310.3(a)(2)(vi).

64.     The TSR prohibits sellers and telemarketers from "[m]isrepresenting, directly or by implication, in the sale of goods or services . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer."   16 C.F.R. § 310.3(a)(2)(iii).

65.     The TSR prohibits sellers and telemarketers from "[m]aking a false or misleading statement to induce any person to pay for goods or services."   16 C.F.R. § 310.3(a)(4).

66.     The TSR applies to "[c]alls initiated by a customer or donor in response to an advertisement relating to investment opportunities, debt relief services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or advertisements involving offers for goods or services described in §310.3(a)(1)(vi) or §310.4(a)(2) through (4)."   16 C.F.R. § 310.6(b)(5)(i).

67.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and

19

Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Pursuant to Section 5(m)(1)(A) of the FTC Act, for the purpose of computing civil penalties, each and every instance that the Defendants violated the TSR, including each and every instance that Defendants used telemarketing to misrepresent any material aspect of the Sales Mentor product to a consumer, such as the product's earning potential or profitability, constitutes an act or practice that violates the TSR.

68.     Defendants' violations of the TSR set forth below were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, U.S.C. § 45(m)(1)(A).

## Count II—TSR Violations
## (All Defendants)

69.     In numerous instances, in connection with telemarketing, Defendants have misrepresented, directly or by implication, material aspects of investment opportunities, including, but not limited to, the risk, liquidity, earnings potential, or profitability of Defendants' Sales Mentor program, such as the claim that consumers will earn or are likely to earn substantial income, such as an average of $10,000 to $20,000 per month.

70.     Defendants' acts and practices, as described in Paragraph 69, violate the TSR prohibition on misrepresenting any material aspect of an investment opportunity, 16 C.F.R. § 310.3(a)(2)(vi).

71.     Defendants' acts and practices, as described in Paragraph 69, also violate the TSR prohibition on misrepresenting any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer, 16 C.F.R. § 310.3(a)(2)(iii).

20

72.     Defendants' acts and practices, as described in Paragraph 69, also violate the TSR prohibition on making a false or misleading statement to induce any person to pay for goods or services, 16 C.F.R. § 310.3(a)(4).

## VIOLATIONS OF PRIOR COMMISSION DETERMINATIONS CONCERNING UNFAIR OR DECEPTIVE ACTS OR PRACTICES IN COMMERCE

73.     Pursuant to Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), if the Commission has determined in a proceeding under section 5(b) of the FTC Act, 15 U.S.C. § 45(b), that an act or practice is unfair or deceptive and issued a final cease and desist order, other than a consent order, with respect to the act or practice, then a person, partnership, or corporation that engages in such act or practice with actual knowledge that such act or practice is unfair or deceptive and is unlawful under Section 5(a)(1) of the FTC Act shall be liable under the FTC Act for such relief as may be appropriate.

74.     In prior litigated decisions the Commission has determined that the acts or practices described in Paragraphs 22 to 47 above are unfair or deceptive and violate Section 5(a)(1) of the FTC Act and issued final cease and desist orders, other than consent orders, with respect to those acts or practices.

### Count III—Violations of Prior Commission Determinations Known to Defendants (Traffic and Funnels, WE Capital, Evans and Welch, and EW Holdings)

75.     As set forth in Paragraphs 48 to 53, at least since receiving the letter and Notices, Common Enterprise Corporate Defendants had actual knowledge that, in connection with the advertising or promotion of money-making opportunities, making false, misleading, or deceptive earnings claims is an unfair or deceptive act or practice, unlawful under Section 5(a)(1) of the FTC Act, and subject to civil penalties.

21

76.     In numerous instances, as set forth in Paragraphs 22 to 47, Common Enterprise Corporate Defendants represented, directly or indirectly, expressly or by implication, that consumers who purchase Defendants' Sales Mentor program will earn or are likely to earn substantial income, such as an average of $10,000 to $20,000 per month.

77.     In truth and in fact, the representations set forth in Paragraph 76 are false, misleading, or were not substantiated at the time the representations were made.

78.     Common Enterprise Corporate Defendants engaged in the acts and practices described in Paragraphs 22 to 47 with the actual knowledge, as set forth in Paragraphs 48 to 53, that in prior litigated decisions the Commission has determined that the acts or practices are unfair or deceptive and violate Section 5(a)(1) of the FTC Act and issued final cease and desist orders, other than consent orders, with respect to those acts or practices.

## CONSUMER INJURY

79.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.   Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

B.     Award monetary and other relief within the Court's power to grant; and

C.     Award any additional relief as the Court determines to be just and proper.

22

Respectfully submitted,

Dated: December 5, 2023

_Virginia G. Rosa_

Virginia G. Rosa
Frances L. Kern
Federal Trade Commission
600 Pennsylvania Ave. NW, Mailstop CC-5201
Washington, DC 20580
(202) 326-3068 / vrosa@ftc.gov
(202) 326-2391 / fkern@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

without knowledge, or with only limited knowledge, of the actual profits or earnings usually and ordinarily received by participants.[4]

    d.    It is an unfair or deceptive trade practice to misrepresent, explicitly or implicitly, that participants will or are likely to earn any specific amount or percentage.[5]

    e.    It is an unfair or deceptive trade practice to misrepresent, explicitly or implicitly, that the represented profits or earnings are the ordinary, typical, or average profits or earnings made by participants.[6] This includes by means of the representation of an earnings figure or the attribution of earnings figures to specific participants, both of which impliedly represent that such figures are likely, are earned by a substantial number of participants, or are the typical, ordinary, or average results, absent clear and conspicuous disclosure of the relevant context, such as the time and effort actually expended by participants who made the amount represented, the percentage of participants making the amount represented, and the amount typically and ordinarily made by participants.[7]

    f.    It is an unfair or deceptive trade practice to misrepresent the profits or earnings that may be anticipated by a prospective participant by failing to disclose conditions or limitations affecting such income, such as expenses to be borne by the participant.[8]

2.    It is an unfair or deceptive trade practice to misrepresent, explicitly or implicitly, that sales of a money-making opportunity will be made to only a limited number of prospective participants (including, for example, that sales will be made to only a limited number of prospective participants in a geographic region), when sales will be made to any person who is willing and able to pay.[9]

---

[4] *Von Schrader Mfg. Co.*, 33 FTC 58, 63-66 (1941).

[5] *Encyclopaedia Britannica*, 87 FTC 421, 450, 486-87, 505, 510, 531-32 (1976); *National Dynamics*, 82 FTC 488, 511-13, 543, 564, 568 (1973), as modified at 85 FTC 1052, 1059-61 (1975); *Holiday Magic*, 84 FTC 748, 948, 984, 1032-1034, 1065, 1069 (1974); *Universal Credit*, 82 FTC 570, 592, 594-95, 632-33, 668-70 (1973); *Universal Elec.*, 78 FTC 265, 272-74, 294, 297 (1971); *Windsor*, 77 FTC 204, 214-17, 220-21, 223 (1970).

[6] *Macmillan*, 96 FTC 208, 232, 235-36, 245-46, 254-55, 301-02, 325-29, 331 (1980); *National Dynamics*, 82 FTC 488, 511-13, 543-44, 564, 568 (1973), as modified at 85 FTC 1052, 1059 (1975); *Abel Allan Goodman*, 52 FTC 982, 984, 987-88, 991-92, 996-97 (1956), order affirmed 244 F.2d 584 (2d Cir. 1957); *Washington Mushroom*, 53 FTC 368, 370, 376, 379-380, 383-84, 386 (1956); *Von Schrader*, 33 FTC 58, 63-66 (1941).

[7] *Macmillan*, 96 FTC 208, 232, 301-02, 326-29, 331 (1980); *National Dynamics*, 82 FTC 488, 511-13, 543-44, 563-64, 568 (1973), as modified at 85 FTC 1052, 1059-61 (1975).

[8] *Encyclopaedia Britannica*, 87 FTC 421, 445-50, 486-87, 505, 510, 531-32 (1976).

[9] *Universal Elec.*, 78 FTC 265, 273-74, 295-97 (1971); *Windsor*, 77 FTC 204, 213, 215-17, 220-21, 223 (1970); *Waltham Watch*, 60 FTC 1692, 1704-05, 1710-11, 1723, 1725, 1727-28, 1730 (1962); *Washington Mushroom*, 53 FTC 368, 370-71, 379-380, 386 (1956).

3. It is an unfair or deceptive trade practice to misrepresent, explicitly or implicitly, that prospective participants will be screened or evaluated for suitability to use or benefit from the money-making opportunity.[10]

4. It is an unfair or deceptive trade practice to misrepresent, explicitly or implicitly, that participants do not need experience in order to earn income.[11]

5. It is an unfair or deceptive trade practice to misrepresent, explicitly or implicitly, that a prospective participant must act immediately to purchase or to be considered for a money-making opportunity.[12]

6. It is an unfair or deceptive trade practice to misrepresent, explicitly or implicitly, that purchasing a money-making opportunity is risk-free or involves little risk.[13]

7. It is an unfair or deceptive trade practice to misrepresent, explicitly or implicitly, the position being offered to prospective participants in a money-making opportunity, such as by failing to disclose that it is a sales position when such is the case.[14]

8. It is an unfair or deceptive trade practice to misrepresent, explicitly or implicitly, the amount or type of training that will be given to participants in a money-making opportunity.[15]

---

[10] *Macmillan*, 96 FTC 208, 272-73, 320, 327, 331 (1980); *Universal Credit*, 82 FTC 570, 608-09, 633, 637, 668, 673 (1973); *Windsor*, 77 FTC 204, 213, 215, 217, 220-21, 223 (1970); *Waltham Watch*, 60 FTC 1692, 1704-05, 1710-11, 1725, 1727-28, 1730 (1962).
[11] *Universal Elec.*, 78 FTC 265, 272-74, 295, 297 (1971); *Washington Mushroom*, 53 FTC 368, 370-71, 378-80, 386 (1956).
[12] *Universal Credit*, 82 FTC 570, 610, 632-33, 637-38, 668, 673 (1973).
[13] *Universal Credit*, 82 FTC 570, 594, 611-12, 633, 638, 668, 673 (1973).
[14] *Encyclopaedia Britannica*, 87 FTC 421, 486-88, 505, 510, 531 (1976).
[15] *Encyclopaedia Britannica*, 87 FTC 421, 486-88, 505, 509-10, 531-32 (1976).

## Notice of Penalty Offenses Concerning Deceptive or Unfair Conduct around Endorsements and Testimonials

The Federal Trade Commission has determined that the following acts or practices in the use of endorsements and testimonials are deceptive or unfair and are unlawful under Section 5 of the Federal Trade Commission Act.

- It is an unfair or deceptive trade practice to make claims which represent, expressly or by implication, that a third party has endorsed a product or its performance when such third party has not in fact endorsed such product or its performance.[1]

- It is an unfair or deceptive trade practice for an advertiser to misrepresent that an endorsement represents the experience, views, or opinions of users or purported users of the product.[2]

- It is an unfair or deceptive trade practice to misrepresent an endorser as an actual user, a current user, or a recent user of a product or service.[3]

- It is an unfair or deceptive trade practice for an advertiser to continue to advertise an endorsement unless the advertiser has good reason to believe that the endorser continues to subscribe to the views presented in the endorsement.[4]

- It is an unfair or deceptive trade practice for an advertiser to use testimonials to make unsubstantiated or otherwise deceptive performance claims even if such testimonials are genuine.[5]

- It is an unfair or deceptive trade practice to fail to disclose a connection between an endorser and the seller of an advertised product or service, if such a connection might materially affect the weight or credibility of the endorsement and if the connection would not be reasonably expected by consumers.[6]

- It is an unfair or deceptive trade practice to misrepresent explicitly or implicitly through the use of testimonials that the experience described by endorsers of a product or service represents the typical or ordinary experience of users of the product or service.[7]

---

[1] *Mytinger & Casselberry, Inc.*, 57 F.T.C. 717 (1960); *Ar-Ex Cosms., Inc.*, 48 F.T.C. 800 (1952); *A. P. W. Paper Co., Inc.*, 38 F.T.C. 1 (1944); *Wilbert W. Haase Co., Inc.*, 33 F.T.C. 662 (1941).

[2] *R. J. Reynolds Tobacco Co.*, 46 F.T.C. 706 (1950).

[3] *Id.*; *Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984).

[4] *Nat'l Dynamics Corp.*, 82 F.T.C. 488 (1973).

[5] *Cliffdale Assocs., Inc.*, 103 F.T.C. 110; *Macmillan, Inc.*, 96 F.T.C. 208 (1980); *Porter & Dietsch, Inc.*, 90 F.T.C. 770 (1977), *aff'd*, 605 F.2d 294 (7th Cir. 1979).

[6] *Cliffdale Assocs., Inc.*, 103 F.T.C. 110.

[7] *Id.*; *Porter & Dietsch, Inc.*, 90 F.T.C. 770; *Nat'l Dynamics Corp.*, 82 F.T.C. 488 (1973), *modified at* 85 F.T.C. 1052 (1975).